## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

THE MICHAEL F. ST. PIERRE REVOCABLE
TRUST, a Maine trust, DENNIS DUPRAY, a
resident of STEPHEN A. ST. GERMAIN, a
Connecticut resident, HANS A. STENFERT
KROESE, an Oregon resident, JAMES D.
HARMON, an Illinois resident, STEPHEN R.
CARAGOL, a Colorado resident, and JACYNDA B.
EARL LIVING TRUST (Jacynda B. Earl, Trustee, a
Florida resident)

       Plaintiffs,

       vs.

MISSION TRUST SERVICES, LLC, a Delaware
limited liability company; MISSION RESIDENTIAL,
LLC, a Virginia limited liability company; MISSION
RESIDENTIAL HOLDINGS, LLC, a Virginia
limited liability company; GRUBB & ELLIS
APARTMENT REIT HOLDINGS, L.P., a Virginia
limited partnership; MISSION BARTON CREEK
LEASECO, LLC, a Delaware limited liability
company; MISSION BATTLEGROUND PARK
LEASECO, LLC, a Delaware limited liability
company; MISSION BRENTWOOD LEASECO,
LLC, a Delaware limited liability company;
MISSION BRILEY PARKWAY LEASECO, LLC, a
Delaware limited liability company; MISSION
CAPITAL CROSSING LEASECO, LLC, a Delaware
limited liability company; MISSION MAYFIELD
DOWNS LEASECO, LLC, a Delaware limited
liability company; MISSION PRESTON WOOD
LEASECO, LLC, a Delaware limited liability
company; MISSION TANGLEWOOD LEASECO,
LLC, a Delaware limited liability company; and
CHRISTOPHER C. FINLAY, a resident of Virginia

       Defendants

     and



)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 3: 10 CV 824 (HEH)

MISSION PRESTON WOOD, DST, a Delaware )
statutory trust; MISSION BATTLEGROUND PARK, )
DST, a Delaware statutory trust; MISSION BRILEY )
PARKWAY, DST, a Delaware statutory trust; )
MISSION BRENTWOOD, DST, a Delaware )
statutory trust; MISSION CAPITAL CROSSING, )
DST, a Delaware statutory trust; MISSION )
MAYFIELD DOWNS, DST, a Delaware statutory )
trust; MISSION BARTON CREEK, DST, a Delaware )
statutory trust; and MISSION TANGLEWOOD, )
DST, a Delaware statutory trust, )
)
               Nominal Defendants. )
)

---

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs The Michael F. St. Pierre Revocable Trust, Dennis Dupray, Stephen A. St. Germain, Hans A. Stenfert Kroese, James D. Harmon, Stephen R. Caragol, and Jacynda B. Earl Living Trust (collectively, as both individual plaintiffs and derivatively in their capacity as beneficial owners of each of the Trusts described below, the "Beneficiaries" and each, individually, a "Beneficiary") by and through their undersigned attorneys, for their Complaint against Defendants Mission Trust Services, LLC ("Mission Trust"), Mission Residential, LLC ("Mission Residential"), Mission Residential Holdings, LLC ("Mission Holdings"), Mission Residential Management, LLC ("Mission Management"), Mission Barton Creek LeaseCo, LLC ("Barton Creek LeaseCo"), Mission Battleground Park LeaseCo, LLC ("Battleground Park LeaseCo"), Mission Brentwood LeaseCo, LLC ("Brentwood LeaseCo"), Mission Briley Parkway LeaseCo, LLC ("Briley Parkway LeaseCo"), Mission Capital Crossing LeaseCo, LLC ("Capital Crossing LeaseCo"), Mission Mayfield Downs LeaseCo, LLC ("Mayfield Downs LeaseCo"), Mission Preston Wood LeaseCo, LLC ("Preston Wood LeaseCo"), Mission Tanglewood LeaseCo, LLC ("Mission Tanglewood LeaseCo"), Christopher C. Finlay ("Finlay"),

and Grubb & Ellis Apartment REIT Holdings, L.P. ("GEAR") (collectively, the "Defendants"), and allege, upon knowledge as to themselves and upon information and belief as to all other matters, as follows:

## NATURE OF THE CAUSE

1.      This complaint presents an emergency application to enjoin Defendants, who are Mission Trust (a trustee of several Delaware statutory trusts) and other parties working in collusion with Mission Trust, from implementing a set of related transactions that would immediately and irreparably harm a group of innocent investors.  Each of these investors is a Beneficiary of one or more Trusts (as hereinafter defined) to whom Mission Trust owes a fiduciary duty. This complaint is made necessary by blatant self-dealing by Mission Trust, in effect destroying a substantial portion of the value of the investments of the various Beneficiaries by selling properties and other interests owned by the Trusts at grossly inadequate "fire-sale" prices and at the worst possible time (when there is no need to sell at all), in order to personally benefit Mission Trust and its affiliates.  In direct response to inquiries made by and concerns raised by the Beneficiaries, Mission Trust has:  (a) refused to respond to concerns expressed by the Beneficiaries of the Trusts, even after representatives of the Beneficiaries made it clear that if such concerns were not addressed litigation would be inevitable; (b) ignored and failed to respond to repeated requests of the Beneficiaries of the Trusts for access to the books and records of the Trusts, even following formal requests made through counsel; (c) implemented unilateral restructuring of agreements between the Trusts and various entities effectively owned and controlled by Mission Trust and its affiliates to the detriment of the Beneficiaries of the Trusts; and (d) proceeded with the transactions objected to by the Beneficiaries and structured such

transactions to allocate the benefits away from the Trusts and therefore away from the Beneficiaries and instead to Mission Trust and its affiliates to the detriment of the Beneficiaries.

## INTRODUCTION

2.     Mission Trust was appointed the trustee of various Delaware statutory trusts, including the eight trusts at issue in this action: Mission Barton Creek, DST ("Barton Creek Trust"), Mission Battleground Park, DST ("Battleground Park Trust"); Mission Brentwood, DST ("Brentwood Trust"); Mission Briley Parkway, DST ("Briley Parkway Trust"); Mission Mayfield Downs, DST ("Mayfield Downs Trust"); Mission Capital Crossing, DST ("Capital Crossing Trust"); Mission Preston Wood, DST ("Preston Wood Trust"); and Mission Tanglewood, DST ("Tanglewood Trust") (collectively, the "Trusts").  Each Beneficiary holds an interest in one or more of the Trusts.

3.     Mission Residential and Mission Holdings solicited the Beneficiaries to invest in the Trusts in order to realize certain tax benefits available under Section 1031 of the Internal Revenue Code.

4.     Each of the Trusts owns a different multifamily apartment community in various locations throughout the United States (each a "Property").  Each Property is leased to a defendant master tenant that is affiliated with Mission Holdings and Mission Trust (each a "Master Tenant").  Each Master Tenant operates a single Property and pays rent to the applicable Trust, pursuant to the terms of a master lease for each Property (each a "Master Lease").  Thus, the source of income for each Trust is the stream of rent payments from a Master Tenant.

5.     In violation of the terms of the Trusts and in violation of the trustee's fiduciary duties, the trustee engaged in a series of self-dealing transactions designed to benefit the trustee,

its manager Finlay, and GEAR at the expense of the Trusts and the Beneficiaries. Among these improper transactions, Mission Trust purported to enter into a transaction with GEAR whereby Mission Trust agreed to sell to GEAR the Trusts' Properties at prices substantially below what the Trusts paid for them and well below what an arm's length transaction would bring on the open market at the appropriate time, in exchange for obtaining an inflated price for the sale of the business of the Mission Trust's affiliated property management company, Mission Residential Management, LLC ("Mission Management"), all to benefit Finlay and the entities he owns or controls.

6.      Mission Trust also purported to amend the terms of six of the eight Master Leases to reduce the income of the Trusts and thereby reduce the financial burdens of the Master Tenants and certain other of the Mission Trust's affiliated companies.

7.      Corresponding with the intended sales of the apartment complexes, Finlay stands to personally profit by selling his property management company to GEAR at an inflated price, while at the same time receiving consulting fees of approximately $1,200,000.

8.      These actions by Mission Trust, as well as many others described below, violate the various agreements governing the Trusts and the Trustee's fiduciary duties to the Beneficiaries.

9.      The Beneficiaries urgently require the Court's intervention to stop Mission Trust's self-dealing and the completely improper sale of all of the Trusts' property to GEAR.

## THE PARTIES

10.      Plaintiff The Michael F. St. Pierre Revocable Trust ("St. Pierre Trust") currently owns, and at all relevant times owned, a beneficial interest in nominal defendant Barton Creek

Trust, a Delaware statutory trust. The trustee of the St. Pierre Trust is Michael F. St. Pierre, who is a Maine resident.

11.    Plaintiff Dennis Dupray currently owns, and at all relevant times owned, a beneficial interest in nominal defendant Battleground Park Trust, a Delaware statutory trust. Dupray is a Colorado resident.

12.    Plaintiff Stephen A. St. Germain currently owns, and at all relevant times owned, a beneficial interest in nominal defendant Brentwood Trust, a Delaware statutory trust. St. Germain is a Connecticut resident.

13.    Plaintiff Hans A. Stenfert Kroese currently owns, and at all relevant times owned, a beneficial interest in nominal defendant Briley Parkway Trust, a Delaware statutory trust. Mr. Stenfert Kroese also currently owns, and at all relevant times owned, a beneficial interest in nominal defendant Tanglewood Trust, a Delaware statutory trust. Stenfert Kroese is an Oregon resident.

14.    Plaintiff James D. Harmon currently owns, and at all relevant times owned, a beneficial interest in nominal defendant Capital Crossing Trust, a Delaware statutory trust. Harmon is an Illinois resident.

15.    Plaintiff Stephen R. Caragol currently owns, and at all relevant times owned, a beneficial interest in nominal defendant Mayfield Downs Trusts, a Delaware statutory trust. Caragol is a Colorado resident.

16.    Plaintiff Jacynda B. Earl Trust ("Earl Trust") currently owns, and at all relevant times owned, a beneficial interest in nominal defendant Preston Wood Trust, a Delaware statutory trust. The trustee of the Earl Trust is Jacynda B. Earl, who is a Florida resident.

17.     Defendant Mission Residential is a Virginia limited liability company with its principal place of business in Virginia. Finlay Partners, LLC ("Finlay Partners") is the sole member of Mission Residential, and Forward Capital, LLC ("Forward Capital") is the sole member of Finlay Partners, LLC.  The members of Forward Capital are Finlay and David A. Wieland ("Wieland").   Finlay is a Virginia resident and Wieland is a Texas resident. Accordingly, Mission Residential is a citizen of Virginia and Texas.   Mission Residential is managed by Finlay.

18.     Defendant Mission Trust is a Delaware limited liability company with its principal place of business located in Virginia.  Mission Residential is the sole member of Mission Trust. Accordingly, as set forth above, Mission Trust is a citizen of Virginia and Texas. Mission Trust is managed by Finlay.

19.     Defendant Mission Holdings is a Virginia limited liability company with its principal place of business in Virginia.  Finlay Partners is the sole member of Mission Holdings, and Forward Capital is the sole member of Finlay Partners.  Accordingly, as set forth above, Mission Holdings is a citizen of Virginia and Texas.  Mission Holdings is managed by Finlay.

20.     Defendant Mission Management is a Virginia limited liability company with its principal place of business in Virginia.   Finlay Partners is the sole member of Mission Management, and Forward Capital is the sole member of Finlay Partners.  Accordingly, as set forth above, Mission Management is a citizen of Virginia and Texas.   Mission Management is managed by Finlay.

21.     Defendant Barton Creek LeaseCo, the master tenant of the Property owned by Barton Creek Trust, is a Virginia limited liability company with its principal place of business in Virginia.  Mission Management is the sole member of Barton Creek LeaseCo.  Accordingly, as

set forth above, Barton Creek LeaseCo is a citizen of Virginia and Texas. Barton Creek LeaseCo is managed by Finlay.

22.     Defendant Battleground Park LeaseCo, the master tenant of the Property owned by Battleground Park Trust, is a Virginia limited liability company with its principal place of business in Virginia. Mission Management is the sole member of Battleground Park LeaseCo. Accordingly, as set forth above, Battleground Park LeaseCo is a citizen of Virginia and Texas. Battleground Park LeaseCo is managed by Finlay.

23.     Defendant Brentwood LeaseCo, the master tenant of the Property owned by Brentwood Trust, is a Virginia limited liability company with its principal place of business in Virginia. Mission Management is the sole member of Brentwood LeaseCo. Accordingly, as set forth above, Brentwood LeaseCo is a citizen of Virginia and Texas. Brentwood LeaseCo is managed by Finlay.

24.     Defendant Briley Parkway LeaseCo, the master tenant of the Property owned by Briley Parkway Trust, is a Virginia limited liability company with its principal place of business in Virginia. Mission Management is the sole member of Briley Parkway LeaseCo. Accordingly, as set forth above, Briley Parkway LeaseCo is a citizen of Virginia and Texas. Briley Parkway LeaseCo is managed by Finlay.

25.     Defendant Capital Crossing LeaseCo, the master tenant of the Property owned by Capital Crossing Trust, is a Virginia limited liability company with its principal place of business in Virginia. Mission Management is the sole member of Capital Crossing LeaseCo. Accordingly, as set forth above, Capital Crossing LeaseCo is a citizen of Virginia and Texas. Capital Crossing LeaseCo is managed by Finlay.

.

26.     Defendant Mayfield Downs LeaseCo, the master tenant of the Property owned by Mayfield Downs Trust, is a Virginia limited liability company with its principal place of business in Virginia. Mission Management is the sole member of Mayfield Downs LeaseCo. Accordingly, as set forth above, Mayfield Downs LeaseCo is a citizen of Virginia and Texas. Mayfield Downs LeaseCo is managed by Finlay.

27.     Defendant Preston Wood LeaseCo, the master tenant of the Property owned by Preston Wood DST, is a Virginia limited liability company with its principal place of business in Virginia. Mission Management is the sole member of Preston Wood LeaseCo. Accordingly, as set forth above, Preston Wood LeaseCo is a citizen of Virginia and Texas. Preston Wood LeaseCo is managed by Finlay.

28.     Defendant Tanglewood LeaseCo, the master tenant of the Property owned by Tanglewood DST, is a Virginia limited liability company with its principal place of business in Virginia. Mission Management is the sole member of Tanglewood LeaseCo. Accordingly, Tanglewood LeaseCo is a citizen of Virginia and Texas. Tanglewood LeaseCo is managed by Finlay.

29.     Defendant Finlay, indirectly through affiliates, owns the controlling interest in, and manages, all of the entity defendants other than GEAR. Finlay is a Virginia resident.

30.     Defendant GEAR is a Virginia limited partnership with its principal place of business in Richmond, Virginia. The general partner of GEAR is Grubb & Ellis Apartment REIT, Inc. ("GEAR GP"). GEAR GP is a Maryland corporation with its principal place of business in Santa Ana, California.

31.     The Trusts, nominal defendants, are all Delaware statutory trusts with their principal places of business in Virginia. Mission Trust is the signatory trustee of each Trust.

## JURISDICTION AND VENUE

32.     The Court possesses diversity jurisdiction over this dispute pursuant to 28 U.S.C.

§ 1332.

33.     Certain of the trusts include a forum selection clause listing a court in Richmond,

Virginia as the required forum.

## FACTUAL BACKGROUND

### I.     The General Structure Of The Trusts Is To Serve Finlay's Interests

34.     At all times relevant to this complaint, Mission Holdings and Mission Residential

and their numerous affiliates and subsidiaries, including but not limited to Mission Trust and

Mission Management, were in business to make real estate investments in, and sponsor the

syndication of, tax deferred investments in multifamily apartment communities.

35.     Defendant Finlay was and is a managing principal, indirect majority owner, and

founding member of the entities affiliated with Mission Residential and Mission Holdings.

36.     The primary investment structure sponsored by Mission Residential and Mission

Holdings and their subsidiaries are tax deferred tenant in common and the Delaware statutory

trust investments.

37.     Between August of 2005 and October of 2008, Mission Residential and Mission

Holdings solicited the Beneficiaries, among many other individuals, to invest in multifamily

apartment communities through various public offerings (the "Offerings"). These offerings were

exempt from registration with the Securities and Exchange Commission under Regulation D.

38.     Mission Residential and Mission Holdings structured the Offerings to allow the

Beneficiaries to qualify for the deferral of federal and state income taxes on capital gains. In

particular, the Offerings were structured as the sale of like kind property under Section 1031 of the Internal Revenue Code ("Section 1031").

39.     Under a 2004 Revenue Ruling from the IRS (Rev. Ruling 2004-84) (the "Revenue Ruling") applicable to like kind exchanges, Mission Holdings structured the Offering as a sale of beneficial interests in eight separate Delaware statutory trusts (*i.e.*, the Trusts).

40.     In general terms, and as used by Mission Residential and Mission Holdings, a Delaware statutory trust is an unincorporated association created by a governing trust agreement under which property is held, managed, administered, invested, and operated by a trustee for the benefit of those persons entitled to a beneficial trust in the property (*i.e.*, the beneficiaries).

41.     Under the terms of the Revenue Ruling, the Trusts and the Beneficiaries could qualify for tax deferral under Section 1031 provided that, among other things, the trustee retained very limited authority.  For instance, in order to qualify for tax deferral under the Revenue Ruling, the trustee is forbidden from entering into new leases and from re-negotiating leases with existing tenants.

42.     Accordingly, Mission Residential or Mission Holdings created a Master Lease at each property.  Under the terms of these Master Leases, the Trust, as landlord, acting through Mission Trust, collects rent and other affiliates, the Master Tenants, are responsible for operating the property.  The Master Tenants, or their agents, are then free to sign leases with the various individual tenants in the apartment communities without violating the Revenue Ruling.

43.     As part of the Offerings, the Master Tenants executed property management agreements with another affiliate, Mission Management, which is owned indirectly by Finlay.

44.     Each of the Trusts specifically detailed below is governed by a trust agreement (the "Trust Agreement," and together, the "Trust Agreements") which, among other things,

appointed yet another Finlay owned and controlled entity – Defendant Mission Trust – as the signatory, or principal acting, trustee.

45.    As a trustee, Mission Trust owed fiduciary duties to the Trusts and their respective Beneficiaries including, but not limited to, a duty of loyalty, a duty to exercise reasonable care, and a duty to preserve and protect the property of the Trusts.

46.    In addition, Mission Trust owes certain contractual duties to the Beneficiaries of the Trusts including, without limitation, the duty to conserve and protect the property of the Trusts.

47.    For each of the Trusts sponsored by Mission Residential or Mission Holdings, capital was raised from the Beneficiaries of each Trust. Mission Residential and Mission Holdings earned significant profits in connection with these offerings and used the remaining amounts to invest equity in the apartment communities.

48.    The Trust would borrow the remaining amount of the purchase price and start-up costs associated with managing the apartment complex from a third-party lender.

49.    Together, Mission Residential and Mission Holdings have sponsored at least 22 Delaware statutory trusts with similar structures.

50.    Organizational charts for each of the Trusts at issue in this action are attached collectively as **Exhibit 1.**

II.    **The Specific Structure of the Trusts**

    A.    **The Preston Wood Trust**

51.    In August 2005, Mission Residential sponsored an offering and issued a Private Placement Memorandum ("PPM") pursuant to which it set forth the intent of Preston Wood Trust to purchase Mission Preston Wood Apartments ("Preston Wood Apartments"), a 194-unit

apartment community in Richardson, Texas, for $10,900,000. (A copy of the Preston Wood Trust Agreement is attached as **Exhibit 2**.)

52.     Preston Wood Trust is a Delaware statutory trust.

53.     Mission Trust is the principal trustee of the Preston Wood Trust.

54.     Pursuant to the PPM, Preston Wood Trust sought to raise up to $3,600,000 by selling beneficial interests in Preston Wood Trust to qualified investors who would become the beneficiaries of the trust.

55.     Deutsche Bank Mortgage Capital, L.L.C. provided approximately $8,400,000 as financing for the remaining purchase price, closing costs, financing costs, and related transactional costs associated with the purchase of Preston Wood Apartments.

56.     Preston Wood Trust raised the capital it sought in the PPM and obtained a loan for the remainder of the capital required for the transaction to close.

57.     Once Preston Wood Trust purchased the Preston Wood Apartments, Preston Wood Trust entered into a master lease ("Preston Wood Master Lease") with Preston Wood Park LeaseCo.

58.     During the term of the Preston Wood Master Lease, Preston Wood LeaseCo is responsible for all costs of operating, managing, leasing, and maintaining the Preston Wood Apartments.

59.     Finlay is the manager of the Preston Wood LeaseCo.

60.     Preston Wood LeaseCo is owned solely by Mission Holdings.

61.     Preston Wood LeaseCo hired Mission Management to manage the Preston Wood Apartments.

62.     Finlay is the manager of Mission Management.

63.     Plaintiff Earl Trust is among the qualified investors who purchased beneficial interests in the Preston Wood Trust.

**B.     The Battleground Park Trust**

64.     In June 2006, Mission Residential sponsored an offering and issued a PPM pursuant to which it set forth the intent of Battleground Park Trust to purchase Mission Battleground Park Apartments ("Battleground Park Apartments"), a 240-unit apartment community in Greensboro, North Carolina, for $13,875,000.  (A copy of the Battleground Park Trust is attached as **Exhibit 3**.)

65.     Battleground Park Trust is a Delaware statutory trust.

66.     Mission Trust is the principal trustee of the Battleground Park Trust.

67.     Pursuant to the PPM, Battleground Park Trust sought to raise $5,800,000 by selling beneficial interests in Battleground Park Trust to qualified investors who would become beneficiaries in the trust.

68.     Deutsche Bank Mortgage Capital, L.L.C. provided approximately $11,200,000 as financing for the remaining purchase price, closing costs, financing costs, and related transactional costs associated with the purchase of the Battleground Park Apartments.

69.     Battleground Park Trust raised the capital it sought in the PPM and obtained a loan for the remainder of the capital required for the transaction to close.

70.     Once Battleground Park Trust purchased the Battleground Park Apartments, Battleground Park Trust entered into a master lease ("Battleground Park Master Lease") with Battleground Park LeaseCo.

71.     During the term of the Battleground Park Master Lease, Battleground Park LeaseCo is responsible for all costs of operating, managing, leasing, and maintaining the Battleground Park Apartments.

72.     Finlay is the manager of the Battleground Park LeaseCo.

73.     Battleground Park LeaseCo is owned solely by Mission Holdings.

74.     Battleground Park LeaseCo hired Mission Management to manage the Battleground Park Apartments.

75.     Plaintiff Dennis Dupray was among the qualified investors who purchased beneficial interests in the Battleground Trust.

C.     **The Briley Parkway Trust**

76.     In July 2006, Mission Residential sponsored an offering and issued a PPM pursuant to which it set forth the intent of Briley Parkway Trust to purchase Mission Briley Parkway Apartments ("Briley Parkway Apartments"), a 360-unit apartment community in Nashville, Tennessee, for $18,000,000.  (A copy of the Briley Parkway Trust is attached as **Exhibit 4**.)

77.     Briley Parkway Trust is a Delaware statutory trust.

78.     Mission Trust is the principal trustee of the Briley Parkway Trust.

79.     Pursuant to the PPM, Briley Parkway Trust sought to raise up to $7,000,000 by selling beneficial interests in Briley Parkway Trust to qualified investors.

80.     Deutsche Bank Mortgage Capital, L.L.C. provided approximately $14,550,000 as financing for the remaining purchase price, closing costs, financing costs, and related transactional costs associated with the purchase of the Briley Parkway Apartments.

81.     Briley Parkway Trust raised the capital it sought in the PPM and obtained a loan for the remainder of the capital required for the transaction to close.

82.     Once Briley Parkway Trust purchased the Briley Parkway Apartments, Briley Parkway Trust entered into a master lease ("Briley Parkway Master Lease") with Briley Parkway LeaseCo.

83.     During the term of the Briley Parkway Master Lease, Briley Parkway LeaseCo is responsible for all costs of operating, managing, leasing, and maintaining the Mission Briley Parkway Apartments.

84.     Finlay is the manager of the Briley Parkway LeaseCo.

85.     Briley Parkway LeaseCo is owned solely by Mission Holdings.

86.     Briley Parkway LeaseCo hired Mission Management to manage the Briley Parkway Apartments.

87.     Plaintiff Hans A. Stenfert Kroese is among the qualified investors who purchased beneficial interests in the Briley Parkway Trust.

**D.     The Brentwood Trust**

88.     In September 2006, Residential sponsored an offering and issued a PPM pursuant to which it set forth the intent of Brentwood Trust to purchase Mission Brentwood Apartments ("Brentwood Apartments"), a 380-unit apartment community in Nashville, Tennessee, for $26,300,000. (A copy of the Brentwood Trust is attached as **Exhibit 5**.)

89.     Brentwood Trust is a Delaware statutory trust.

90.     Mission Trust is the principal trustee of the Brentwood Trust.

91.     Pursuant to the PPM, Brentwood Trust sought to raise up to $10,250,000 by selling beneficial interests in Brentwood Trust to qualified investors.

92.     J.P. Morgan Mortgage Capital, Inc. provided approximately $20,000,000 as financing for the remaining purchase price, closing costs, financing costs, and related transactional costs associated with the purchase of the Brentwood Apartments.

93.     Brentwood Trust raised the capital it sought in the PPM and obtained a loan for the remainder of the capital required for the transaction to close.

94.     Once Brentwood Trust purchased the Brentwood Apartments, Brentwood Trust entered into a master lease ("Brentwood Master Lease") with Brentwood LeaseCo.

95.     During the term of the Brentwood Master Lease, Brentwood LeaseCo is responsible for all costs of operating, managing, leasing, and maintaining the Brentwood Apartments.

96.     Finlay is the manager of the Brentwood LeaseCo.

97.     Mission Trust is the principal trustee of the Brentwood Trust.

98.     Brentwood LeaseCo is owned solely by Mission Holdings.

99.     Brentwood LeaseCo hired Mission Management to manage the Brentwood Apartments.

100.    Plaintiff Stephen F. St. Pierre is among the qualified investors who purchased beneficial interests in the Brentwood Trust.

E.      **The Mayfield Downs Trust**

101.    In April 2007, Mission Holdings sponsored an offering and issued a PPM pursuant to which it set forth the intent of Mayfield Downs Trust to purchase Mission Mayfield Downs Apartments ("Mayfield Downs Apartments"), a 258-unit apartment community in Grand Prairie, Texas, for $19,100,000. (A copy of the Mayfield Downs Trust is attached as **Exhibit 6.**)

102.    Mayfield Downs Trust is a Delaware statutory trust.

103.    Mission Trust is the principal trustee of the Mayfield Downs Trust.

104.    Pursuant to the PPM, Mayfield Downs Trust sought to raise up to $6,200,000 by selling beneficial interests in Mayfield Downs Trust to qualified investors.

105.    Deutsche Bank Mortgage Capital, L.L.C. provided approximately $16,235,000 as financing for the remaining purchase price, closing costs, financing costs, and related transactional costs associated with the purchase of the Mayfield Downs Apartments.

106.    Mayfield Downs Trust raised the capital it sought in the PPM and obtained a loan for the remainder of the capital required for the transaction to close.

107.    Once Mayfield Downs Trust purchased the Mayfield Downs Apartments, Mayfield Downs Trust entered into a master lease ("Mayfield Downs Master Lease") with Mayfield Downs LeaseCo.

108.    During the term of the Mayfield Downs Master Lease, Mayfield Downs LeaseCo is responsible for all costs of operating, managing, leasing, and maintaining the Mayfield Downs Apartments.

109.    Finlay is the manager of the Mayfield Downs LeaseCo.

110.    Mayfield Downs LeaseCo is owned solely by Mission Holdings.

111.    Mayfield Downs LeaseCo hired Mission Management to manage the Mayfield Downs Apartments.

112.    Plaintiff Stephen R. Caragol is among the qualified investors who purchased beneficial interests in the Mayfield Downs Trust.

F.      **The Capital Crossing Trust**

113.    In December 2007, Mission Holdings sponsored an offering and issued a PPM pursuant to which it set forth the intent of Capital Crossing Trust to purchase Mission Capital

Crossing Apartments ("Capital Crossing Apartments"), a 356-unit apartment community in Raleigh, North Carolina, for $23,250,000. (A copy of the Capital Crossing Trust is attached as **Exhibit 7**.)

114. Capital Crossing Trust is a Delaware statutory trust.

115. Mission Trust is the principal trustee of the Capital Crossing Trust.

116. Pursuant to the PPM, Capital Crossing Trust sought to raise up to $10,300,000 by selling beneficial interests in Capital Crossing Trust to qualified investors.

117. Red Mortgage Capital, Inc. provided approximately $17,700,000 as financing for the remaining purchase price, closing costs, financing costs, and related transactional costs associated with the purchase of the Capital Crossing Apartments.

118. Capital Crossing Trust raised the capital it sought in the PPM and obtained a loan for the remainder of the capital required for the transaction to close.

119. Once Capital Crossing Trust purchased the Capital Crossing Apartments, Capital Crossing Trust entered into a master lease ("Capital Crossing Master Lease") with Capital Crossing LeaseCo.

120. During the term of the Capital Crossing Master Lease, Capital Crossing LeaseCo is responsible for all costs of operating, managing, leasing, and maintaining the Capital Crossing Apartments.

121. Finlay is the manager of the Capital Crossing LeaseCo.

122. Capital Crossing LeaseCo is owned solely by Mission Holdings.

123. Capital Crossing LeaseCo hired Mission Management to manage the Capital Crossing Apartments.

124. Plaintiff James D. Harmon is among the qualified investors who purchased beneficial interests in the Capital Crossing Trust.

### G.     The Barton Creek Trust

125. In September 2008, Mission Residential sponsored an offering and issued a PPM pursuant to which it set forth the intent of Barton Creek Trust to purchase Barton Creek Park Apartments, a 298-unit apartment community in Austin, Texas, for $30,000,000. (A copy of the Barton Creek Trust is attached as **Exhibit 8.**)

126. Barton Creek Park Trust is a Delaware statutory trust.

127. Mission Trust is the principal trustee of the Barton Creek Park Trust.

128. Pursuant to the PPM, Barton Creek Trust sought to raise $13,750,000 by selling beneficial interests in Barton Creek Trust to qualified investors.

129. Deutsche Bank Berkshire Mortgage, Inc. provided approximately $21,200,000 as financing for the remaining purchase price, closing costs, financing costs, and related transactional costs associated with the purchase of the Barton Creek Apartments.

130. Barton Creek Trust raised the capital it sought in the PPM and obtained a loan for the remainder of the capital required for the transaction to close.

131. Once Barton Creek Trust purchased the Barton Creek Apartments, Barton Creek Trust entered into a master lease ("Barton Creek Master Lease") with Barton Creek LeaseCo.

132. During the term of the Barton Creek Master Lease, Barton Creek LeaseCo is responsible for all costs of operating, managing, leasing, and maintaining the Barton Creek Apartments.

133. Finlay is the manager of the Barton Creek LeaseCo.

134. Barton Creek LeaseCo is owned solely by Mission Holdings.

135.     Barton Creek LeaseCo hired Mission Management to manage the Barton Creek Apartments.

136.     Plaintiff St. Pierre Trust is among the qualified investors who purchased beneficial interests in the Barton Creek Trust.

**H.     The Tanglewood Trust**

137.     In October 2008, Mission Residential sponsored an offering and issued a PPM pursuant to which it set forth the intent of Tanglewood Trust to purchase Mission Tanglewood Park Apartments ("Tanglewood Park Apartments"), a 364-unit apartment community in Austin, Texas, for $20,400,000. (A copy of the Tanglewood Trust is attached as **Exhibit 9**.)

138.     Tanglewood Park Trust is a Delaware statutory trust.

139.     Mission Trust is the principal trustee of the Tanglewood Park Trust.

140.     Pursuant to the PPM, Tanglewood Trust sought to raise $13,750,000 by selling beneficial interests in Tanglewood Trust to qualified investors.

141.     Deutsche Bank Berkshire Mortgage, Inc. provided approximately $15,275,000 as financing for the remaining purchase price, closing costs, financing costs, and related transactional costs associated with the purchase of the Tanglewood Apartments.

142.     Tanglewood Trust raised $9,100,000 and obtained a loan for the remainder of the capital required for the transaction to close.

143.     Once Tanglewood Trust purchased the Tanglewood Apartments, Tanglewood Trust entered into a master lease ("Tanglewood Master Lease") with Tanglewood LeaseCo.

144.     During the term of the Tanglewood Master Lease, Tanglewood LeaseCo is responsible for all costs of operating, managing, leasing, and maintaining the Tanglewood Apartments.

145.   Finlay is the manager of the Tanglewood LeaseCo.

146.   Tanglewood LeaseCo is owned solely by Mission Holdings.

147.   Tanglewood LeaseCo hired Mission Management to manage the Tanglewood Apartments.

148.   Plaintiff Hans Stenfert Kroese is among the qualified investors who purchased beneficial interests in the Tanglewood Trust.

III.   **Mission Trust Improperly Amends Six Of The Eight Master Leases**

  A.   **Breach of the Trusts: the Trust Agreements and Loan Documents Prohibited the Trustee's Lease Amendments.**

149.   Beginning in mid 2009 and continuing through 2010, Finlay caused Mission Trust and several of the Master Tenants (including six of the eight Master Tenant defendants in this case) to amend the Master Leases applicable to the Trusts' Properties in order to reduce the payment of rent to the applicable Trusts (the "Lease Amendments"). Finlay executed the Lease Amendments on behalf of both parties.

150.   Among other things, the Lease Amendments relieved the Master Tenants of the absolute obligation to pay the full amount of the Stated Rent (as defined in the Master Leases) and instead required the Master Tenants to pay on a "cash flow" basis only, such that the Master Tenants' obligation to pay the Stated Rent on a current basis does not exceed the amount of available cash after the payment and/or funding of specified operating expenses and reserves. Also, under certain circumstances, the Master Tenants were permitted to withhold any payments of available cash flow to the Trusts for up to 90 days.

151.    In addition, the Lease Amendments permitted the Master Tenants to recover any unreimbursed advances out of any net sales proceeds received by the landlord upon the sale of the properties (as opposed to having no such right under the original master lease).

152.    Each of the Trust Agreements either prohibits Mission Trust from performing any act constituting an event of default under the Trusts' loan agreements, or states that the purpose of the Trust is to comply with the terms of the loan agreements.  Specifically, seven of the eight Trust Agreements provide:

> Section 2.05   ... neither the Trust, the Trustees nor any other Person on behalf of the Trust shall have any authority to do any of the following without (1) Lender's prior written consent ... (i) perform any act in contravention of or constituting an event of default under the Loan Documents.

See Exhibits 2, 3, 4, 6, 7, 8, and 9 (§ 2.05(a)).  Section 2.03 of each of the Trust Agreements also provides that among the purposes of the Trust is to comply with the terms of the loan documents. See Exhibits 2 – 9 (§ 2.03(ii)).   The loan documents applicable to each Trust forbid the amendment of the Master Leases without the prior written consent of the lender.  Thus, any amendment of the Master Leases without the prior written consent of the lenders constitutes a breach of the loans, potentially subjecting the Trusts to severe penalties, including increased interest expense, possible foreclosure, and other remedies.

153.    Notwithstanding the plain language to the contrary in the Trusts and the Trusts' loan documents, Mission Trust – through its manager, Defendant Finlay – amended each of the Master Leases (with the exception of the Barton Creek and Briley Parkway Master Leases) without obtaining the lenders' prior written consent.

154.   The Trustee breached both the terms of the Trusts' loan agreements and, consequently the terms of the Trusts, by amending six of the Master Lease agreements without first obtaining the lenders' consents.

**B.     Breach of the Master Leases: the Master Leases and Loan Documents
Prohibited the Master Lessees' Execution of the Lease Amendments.**

155.   The loan documents applicable to each Trust provide that the Master Leases may not be amended without the prior written consent of the lender.

156.   Each of the Master Leases provide in Section 16.01 that it shall be an event of default under said lease "if any act or omission of Tenant results in the breach of any indenture, deed of trust, mortgage or other instruments (beyond any applicable notice and cure periods contained therein) to which Landlord is party or to which the Demised Premises is bound or may be affected."

157.   The Master Tenants breached six of the eight Master Leases by executing the lease amendments without first obtaining the lenders' consent.

**C.     The Trustee's Self-Dealing:  The Trustee Breached its Fiduciary Duty
by Amending the Master Lease in a Manner which Harmed the Trust
but Benefitted the Trustee's Affiliates.**

158.   Each of the Trust Agreements prohibits Mission Trust from transacting business with Affiliates except on an "arms-length basis and pursuant to enforceable agreements" while any obligation remains outstanding on the applicable mortgage loan.  See Trust Agreements, § 2.05(b)(ix) (Exhibits 2-9).

159.   The term "Affiliate" is defined in the Trust Agreements to include entities that share, among other affiliations, direct or indirect common control. Each of the Master Tenants is

an Affiliate of Mission Trust.   See Trust Agreements, Article I, Definition of "Affiliate" (Exhibits 2-9).

160.   Mission Trust, as the trustee for the Trusts, amended six of the Master Leases for the benefit of the affiliated Master Tenants without first seeking to exercise remedies against the Master Tenants in accordance with the remedies provisions of the applicable Master Leases, which include typical remedies landlords have against non-paying tenants.

161.   The Lease Amendments were beneficial only to the Master Tenants, providing no corresponding benefit to their respective Trusts or the Beneficiaries of those Trusts.   For example, pursuant to Article 23 of each Master Lease, the Master Tenants are each entitled to a Lease Termination Fee in the event of a sale of the Property.   The Lease Termination Fee varies between two percent (2%) and four percent (4%) of the gross purchase price of the Property. Significantly, in connection with the Lease Amendments, Finlay did not cause the Master Tenants – which he controls and indirectly owns – to subordinate the Lease Termination Fee to the amount of any accrued Stated Rent that was not paid on a current basis under the terms of the Lease Amendments.   As a result, following the Lease Amendments, in the event of a sale, the Master Tenants would actually be paid Lease Termination Fees before the payment of accrued but unpaid Stated Rent.   Thus, Mission Trust violated the prohibition in the Trust Agreements on transacting business with Affiliates except on arms-length terms.

### D.   The Mayfield Downs Master Lease Amendment

162.   Mission Trust, through Mayfield Downs Trust, amended the Mayfield Downs Master Lease on June 15, 2009 (the "Mayfield Downs Master Lease Amendment").   Copies of the Mayfield Downs Master Lease and the Mayfield Downs Master Lease Amendment are attached, respectively, as **Exhibits 10 and 11**.

163.   The Mayfield Downs Master Lease Amendment purports to be retroactively effective as of June 1, 2009.

164.   Finlay executed the Mayfield Downs Master Lease Amendment on behalf of both parties to the agreement.   Specifically, Finlay executed the Mayfield Downs Master Lease Amendment on behalf of Mayfield Downs Master Tenant as the master tenant, and Mayfield Downs Trust, as the master landlord and trustee.   Because the Mayfield Downs Master Lease Amendment benefited the Mayfield Downs Master Tenant (which Finlay owns and controls), and harmed the Mayfield Downs Trust and its Beneficiaries, Finlay's actions constituted a breach of the Mayfield Downs Trust Agreement and blatant breach of fiduciary duty.

E.   **The Capital Crossing Master Lease Amendment**

165.   Mission Trust, through Capital Crossing Trust amended the Mission Capital Crossing Master Lease on October 8, 2009 (the "Capital Crossing Master Lease Amendment"). Copies of the Capital Crossing Master Lease and the Capital Crossing Master Lease Amendment are attached, respectively, as **Exhibits 12 and 13**.

166.   The Capital Crossing Master Lease Amendment purports to be retroactively effective as of September 1, 2009.

167.   Finlay executed the Capital Crossing Master Lease Amendment on behalf of both parties to the agreement.   Specifically, Finlay executed the Capital Crossing Master Lease Amendment on behalf of Capital Crossing Master Tenant as the master tenant, and Capital Crossing Trust, as the master landlord and trustee.   Because the Capital Crossing Master Lease Amendment benefited the Capital Crossing Master Tenant (which Finlay owns and controls), and harmed the Capital Crossing Trust and its Beneficiaries, Finlay's actions constituted a breach of the Capital Crossing Trust Agreement and blatant breach of fiduciary duty.

### F.     The Preston Wood Master Lease Amendment

168.    Mission Trust, through Preston Wood Trust amended the Preston Wood Master Lease on October 8, 2009 (the "Preston Wood Master Lease Amendment").  Copies of the Preston Wood Master Lease and the Preston Wood Master Lease Amendment are attached, respectively, as **Exhibits 14 and 15**.

169.    The Preston Wood Master Lease Amendment purports to be retroactively effective as of September 1, 2009.

170.    Finlay executed the Preston Wood Master Lease Amendment on behalf of both parties to the agreement.  Specifically, Finlay executed the Preston Wood Master Lease Amendment on behalf of Preston Wood Master Tenant as the master tenant, and Preston Wood Trust, as the master landlord and trustee.  Because the Preston Wood Master Lease Amendment benefited the Preston Wood Master Tenant (which Finlay owns and controls), and harmed the Preston Wood Trust and its Beneficiaries, Finlay's actions constituted a breach of the Preston Wood Trust Agreement and blatant breach of fiduciary duty.

### G.     The Battleground Park Master Lease Amendment

171.    Mission Trust, through Battleground Park Trust amended the Battleground Park Master Lease on October 8, 2009 (the "Battleground Park Master Lease Amendment").  Copies of the Battleground Park Master Lease and the Battleground Park Master Lease Amendment are attached, respectively, as **Exhibits 16 and 17**.

172.    The Battleground Park Master Lease Amendment purports to be retroactively effective as of September 1, 2009.

173.    Finlay executed the Battleground Park Master Lease Amendment on behalf of both parties to the agreement.  Specifically, Finlay executed the Battleground Park Master Lease

Amendment on behalf of Battleground Park Master Tenant as the master tenant, and Battleground Park Trust, as the master landlord and trustee. Because the Battleground Park Master Lease Amendment benefited the Battleground Park Master Tenant (which Finlay owns and controls), and harmed the Battleground Park Trust and its Beneficiaries, Finlay's actions constituted a breach of the Battleground Park Trust Agreement and blatant breach of fiduciary duty.

**H.     The Brentwood Master Lease Amendment**

174.    Mission Trust, through Brentwood Trust amended the Brentwood Master Lease on April 26, 2010 (the "Brentwood Master Lease Amendment"). Copies of the Brentwood Master Lease and the Brentwood Master Lease Amendment are attached, respectively, as **Exhibits 18 and 19**.

175.    The Brentwood Master Lease Amendment states that it is effective as of May 1, 2010.

176.    Finlay executed the Brentwood Master Lease Amendment on behalf of both parties to the agreement. Specifically, Finlay executed the Brentwood Master Lease Amendment on behalf of Brentwood Master Tenant as the master tenant, and Brentwood Trust, as the master landlord and trustee. Because the Brentwood Master Lease Amendment benefited the Brentwood Master Tenant (which Finlay owns and controls), and harmed the Brentwood Trust and its Beneficiaries, Finlay's actions constituted a breach of the Brentwood Trust Agreement and blatant breach of fiduciary duty.

**I.      The Tanglewood Master Lease Agreement**

177.    Mission Trust, through Tanglewood Trust amended the Tanglewood Master Lease on April 26, 2010 (the "Tanglewood Master Lease Amendment"). Copies of the Tanglewood

Master Lease and the Tanglewood Master Lease Amendment are attached, respectively, as **Exhibits 20 and 21**.

178.    The Tanglewood Master Lease Amendment states that it is effective as of May 1, 2010.

179.    Finlay executed the Tanglewood Master Lease Amendment on behalf of both parties to the agreement.  Specifically, Finlay executed the Brentwood Master Lease Amendment on behalf of Tanglewood Master Tenant as the master tenant, and Tanglewood Trust, as the master landlord and trustee.  Because the Tanglewood Master Lease Amendment benefited the Tanglewood Master Tenant (which Finlay owns and controls), and harmed the Tanglewood Trust and its Beneficiaries, Finlay's actions constituted a breach of the Tanglewood Trust Agreement and blatant breach of fiduciary duty.

**IV.    In Violation of its Fiduciary and Contractual Duties, The Trustee Purports to Enter a Transaction With GEAR To Sell The Property of Each Trust for *Less Than* Fair Value and The Business of Mission Management for *Inflated* Value.**

180.    During the summer of 2010, Finlay, as the manager of various affiliated entities, including Mission Trust, negotiated a sale transaction with GEAR.

181.    Section 5.03 of Trust Agreements provides:

> 5.03--<u>Sale of Trust Property by Trustees Is Binding</u>.  Any sale or other conveyance of the Trust Property or any part thereof by the Signatory Trustee made pursuant to the terms of this Trust Agreement shall bind the Investors and be effective to transfer or convey all rights, title and interest of the Trustees and the Investors in and to the trust Property.  Nevertheless, prior to the Signatory Trustee entering into a binding contract to sell or convey the Real Estate, the Signatory Trustee shall notify the Investors of such potential transaction and solicit their views on the transaction.  The Signatory Trustee shall consider the Investor's views and opinions in good faith, but not be bound by such opinions and the decision to do the transaction or not rests solely with the Signatory Trustee.

182.   Although Mission Trust was required under this section to seek and consider in good faith the views and opinions of the Beneficiaries regarding a potential sale to GEAR, Mission Trust did not do so.   Mission Trust did not even notify the Beneficiaries about the potential transaction until Monday, August 23, 2010.  Conference calls were set up for August 24 and 25 to discuss the possible transaction.  Beneficiaries were then told they had until Thursday, August 26, 2010, at 12:00 pm EST to provide written comments and opinions regarding the potential transaction.  The Beneficiaries who did not have a conference call until the afternoon of August 25 had less than one day to provide written comments.

183.   Despite the short deadline, scores of Beneficiaries provided comments objecting to the potential transaction.  Mission Trust promised to make the written comments available to all Beneficiaries, but based on the overwhelmingly-negative response, refused to make the comments available.  When the Beneficiaries later collected the written comments, they learned that more than 80% of the comments were critical of and objected to the proposed transaction.

184.   Mission Trust did not consider these comments in good faith.  Rather, on August 27, 2010, one day after receiving the comments, Mission Trust entered into a series of related agreements to sell, among other assets, the following to GEAR: (a) the Property of each of the Trusts (*i.e.*, the Trusts' respective apartment communities and other property); and (b) the business of Mission Management, including the agreements to manage the Properties and numerous other apartment communities owned by similar trusts managed by Mission Trust (the "GEAR Transaction").

185.   GEAR's publicly registered general partner, GEAR GP, announced the GEAR Transaction on August 31, 2010 in a Form 8-K filing with the Securities and Exchange Commission.   The filing described the transaction as involving the acquisition of nine

multifamily properties (the eight Properties at issue in this action and one other unrelated property), the provision of tax protection agreements for the Beneficiaries (to give limited indemnification for adverse tax consequences), and the acquisition of Mission Management's business. A copy of the 8-K filing is attached, without supporting exhibits, as **Exhibit 22**.

186.    The GEAR Transaction includes the following basic agreements: (a) an Asset Purchase Agreement for the sale of Mission Management's business (the "Mission Management Asset Purchase Agreement"); and (b) eight separate Purchase and Sale Agreements for the sale of the assets of each Trust (each a "Purchase and Sale Agreement"). A copy of the Mission Management Asset Purchase Agreement, which was included as an attachment (without accompanying exhibits and schedules) to the GEAR GP's August 31, 2010 8-K filing is attached as **Exhibit 22**. Copies of following Purchase and Sale Agreements, which were also included in the GEAR GP's 8-K filing without accompanying exhibits and schedules), are attached: Tanglewood Purchase and Sale Agreement (**Exhibit 23**); Capital Crossing Purchase and Sale Agreement (**Exhibit 24**); Barton Creek Purchase and Sale Agreement (**Exhibit 25**); Briley Parkway Purchase and Sale Agreement (**Exhibit 26**); Preston Wood Purchase and Sale Agreement (**Exhibit 27**); Battleground Park Purchase and Sale Agreement (**Exhibit 28**); Mayfield Downs Purchase and Sale Agreement (**Exhibit 29**); and Brentwood Purchase and Sale Agreement (**Exhibit 30**).

187.    The GEAR Transaction constitutes blatant self-dealing by Finlay and the various affiliates of Mission Trust. Through the GEAR Transaction, Finlay, with the active assistance and cooperation of GEAR, attempts to sell the Trusts' Properties at discounted prices in exchange for selling his own business at an inflated price. As is detailed below, Finlay negotiated substantially lower consideration for the sale of the Properties of the Trusts in

exchange for above market value for the sale of Mission Management, which he owns and controls.

A.     **The Consideration for the Sale of the Trusts' Property is Inadequate.**

188.    The sale of the Trusts' property pursuant to the Purchase and Sale Agreements constitutes breaches of the fiduciary and contractual duties Mission Trust owes the Trusts and the Beneficiaries.

189.    Under the Purchase and Sale Agreements, the Trusts will receive much less than the consideration to be derived from an arms-length transaction for the sale of the Properties at an appropriate time, in part, because Mission Trust is improperly selling the Properties at a historic low point in the market values for such assets.  There is no present need to sell the Properties. Each Property is meeting its debt service obligations and is not in default.  A prudent trustee would wait for the market to improve before considering a sale.  Yet, Finlay has caused Mission Trust to agree to sell the Properties so that he and the affiliates of Mission Trust will realize undeserved profits on the sale of the business of Mission Management.

190.    In most cases, the GEAR Transaction will result in the Trusts receiving substantially less than what they paid for the Properties.  For each Purchase and Sale Agreement, the following chart sets forth the original purchase price of the Properties, the GEAR Transaction price, the amount of the existing loan that will be assumed, the equity portion of the GEAR price, the amount of the original investment made by the Beneficiaries, the approximate loss of investment due to the GEAR Transaction, and the percentage of the original investment lost. The information in the chart demonstrates the devastating impact of the GEAR Transaction on the Trusts and the Beneficiaries.

| Trust | Original Purchase Price | GEAR Sales Price | Loan Amount | GEAR Price Less Loan | Equity Investment | Loss of Initial Investment | % of Investment Lost |
|---|---|---|---|---|---|---|---|
| Preston Wood Trust (Richardson, TX) | $10,900,000 | $9,733,000 | $8,400,000 | $1,333,000 | $3,900,000 | $(2,567,000) | 65.8% |
| Battleground Park Trust (Greensboro, NC) | $13,875,000 | $12,821,000 | $11,200,000 | $1,621,000 | $5,800,000 | $(4,179,000) | 72.1% |
| Briley Parkway Trust (Nashville, TN) | $18,000,000 | $22,123,000 | $14,550,000 | $7,573,000 | $7,700,000 | $(127,000) | 1.6% |
| Brentwood, Trust (Nashville, TN) | $26,300,000 | $27,857,000 | $20,000,000 | $7,857,000 | $10,250,000 | $(2,393,000) | 23.3% |
| Mayfield Downs Trust (Grand Prairie, TX) | $19,100,000 | $18,027,000 | $16,235,000 | $1,792,000 | $6,200,000 | $(4,408,000) | 71.1% |
| Capital Crossing Trust (Raleigh, NC) | $23,250,000 | $20,667,000 | $17,700,000 | $2,967,000 | $10,300,000 | $(7,333,000) | 71.2% |
| Barton Creek Trust (Austin, TX) | $30,000,000 | $25,929,000 | $21,200,000 | $4,729,000 | $13,750,000 | $(9,021,000) | 65.6% |
| Tanglewood Trust (Austin, TX) | $20,400,000 | $19,862,000 | $15,275,000 | $4,587,000 | $9,100,000 | $(4,513,000) | 49.6% |
| **TOTALS** | $161,825,000 | $157,019,000 | $124,560,000 | $32,459,000 | $67,000,000 | (34,541,000) | 51.6% |

191.   As reflected above, if the Beneficiaries received cash for the transaction (which they will not), they would lose, on average, more than 51% of their original investments, a cumulative loss of approximately $34.5 million of the $67 million total investment in the Trusts. However, the situation is worse because the consideration will not be paid in cash. Instead, Mission Trust and GEAR agreed that the Beneficiaries should be required to accept limited

partner units in GEAR (the "OP Units"), with each unit valued at $9.00 for purposes of the Purchase and Sale Agreement ("OP Unit Price"). See Purchase and Sale Agreements, § 3(b).

192.    The actual value of the OP Unit Price is substantially lower than $9.00. At book value, GEAR's asset holdings support an OP Unit Price of no more than approximately $6.00. Moreover, the GEAR asset holdings have not been adjusted to account for the declining value of real estate projects in the aftermath of the Great Recession. Thus, on a true value basis, the Beneficiaries will likely lose much more than $34.5 million as the purchase prices will be paid in exchange for OP Units with inflated values (rather than cash).

**B.      The GEAR Transaction Eliminates the Beneficiaries' Ability to do Additional 1031, Like-kind Transactions in the Future, a Significant Benefit of the Trust Investment and Primary Reason Many Beneficiaries Selected a Delaware Statutory Trust Investment**

193.    Regardless of the sufficiency of the purchase prices and the true value of the OP Units, Finlay also has caused Mission Trust to breach its fiduciary duties and the terms of the Trust Agreements by agreeing to structure the consideration for the Purchase and Sale Agreements as conversion to interests in the OP Units.

194.    As beneficiaries in Delaware statutory trusts, the Beneficiaries can continue to receive tax benefits indefinitely. If Mission Trust were to sell the Properties for cash, the Beneficiaries could reinvest that cash through another like-kind exchange to continue to receive tax benefits. This benefit would be lost if the GEAR Transaction closes. Mission Residential and Mission Holdings solicited the Beneficiaries' investments based principally upon the tax benefits of the Trusts. Now, through the GEAR Transaction, Mission Trust has agreed to negate the very purpose of the investment by forcing the conversion of the Trust interests to OP Units.

195.    As acknowledged by GEAR through its provision of Tax Protection Agreements for the Beneficiaries, the sale of the Properties will have adverse tax consequences for the Beneficiaries. Once the Beneficiaries' investments are converted to OP Units, the Beneficiaries will not be able to sell their interests in the OP Units without realizing a taxable gain, thereby defeating the primary purpose of the investment in a Trust.

196.    Although Section 3(c)(iii) of the Purchase and Sale Agreements require GEAR to provide "Tax Protection Agreements" to any Beneficiary who desires one, it is clear that the tax protection will be limited. Despite repeated requests, GEAR and Mission Trust failed to provide copies of the exhibits to the Purchase and Sale Agreements and the Mission Management Asset Purchase Agreement. At best, the Tax Protection Agreements extend to sales of property by GEAR. They do not provide any tax protection should the Beneficiaries sell their OP Units. Thus, should the Beneficiaries ever wish to end their investment in GEAR, they will suffer often extreme tax consequences.

197.    Further, according to the GEAR GP's 8-K filing, the Tax Protection Agreements will expire in seven years. See Exhibit 22, at 1 – 2. Thus, any property sales made by GEAR more than seven years after the GEAR Transaction will not include tax protection. This obviously will incentivize GEAR to wait seven years before selling properties in the REIT.

C.    **The Failure to Disburse the Trusts' Capital Reserves.**

198.    Pursuant to Section 7.05 of the Master Leases, and as promised by Mission Residential and/or Mission Holdings in the various PPM's associated with the Offerings, each Master Tenant is required upon termination of the Master Lease to return any amounts remaining in the Capital Reserves and/or the Replacement Reserves to the Trusts.

199.    Under the terms of the Purchase and Sale Agreements, the Capital Reserves and/or Replacement Reserves will not be returned to the Trusts, but instead Finlay will cause Mission Trust to transfer these reserves to GEAR.

200.    As of August 31, 2010 the Trusts had $3,472,771 in Capital Reserves and/or Replacement Reserves that should be returned to the Trusts, but, instead, will simply be handed over to GEAR.

201.    Betraying its contractual and fiduciary obligations to the Trusts and the Beneficiaries, Mission Trust failed to protect the Trusts' and Beneficiaries' interests in the reserves.

**D.    Mission Trust Failed to Consider the Material Adverse Effects of the Termination of GEAR's Disaffiliation with Various Grubb & Ellis Entities.**

202.    On November 1, 2010, in an 8-K filing with the Securities Exchange Commission, GEAR reported, among other things, that: (a) Grubb & Ellis Apartment REIT Advisor, LLC ("GE Advisor") provided notice of the termination of its Advisory Agreement with GEAR; and (b) Grubb & Ellis Securities, Inc. ("GES") provided notice of termination of its Dealer Manager Agreement with GEAR.

203.    In a press release issued that day, GE Advisor stated:

> Over the past few months there have been an increasing divergence in perspective between [GE Advisor], as the advisor, and the REIT's board of directors, which has resulted in fundamental differences of opinion as it relates to strategic direction of the REIT. Grubb & Ellis will continue to work constructively with the REIT board over the coming months to ensure that the interests of shareowners are preserved throughout the transition period....

204.    In the 8-K filing, GEAR stated that it intends to replace GE Advisor with a new advisor owned by American Realty Capital, LLC and ROC REIT Advisors, LLC.   It also

announced that it intends to replace GES with Realty Capital Securities, LLC as dealer manager. It made no assurance that it will successfully negotiate agreements with either entity. Moreover, GEAR stated that GES suspended sales of shares in GEAR until changes have been made to GEAR's offering prospectus. GEAR reported that it will file a supplement to its offering prospectus "as soon as possible."

205. Despite this highly material change in the structure and support for GEAR's ongoing and future operations, Finlay did not cause Mission Trust or its affiliates to reevaluate the propriety of proceeding to implement the GEAR Transaction. Nor did Finlay solicit the views of the Beneficiaries about these developments concerning the counter-party to the GEAR Transaction, as required by Section 5.03 of the Trust Agreements.

206. Instead, according to financial news reports, Finlay and GEAR closed the Mission Management Asset Purchase Agreement portion of the GEAR Transaction on November 5, 2010, four days after GEAR's announcement of the dramatic changes in its affiliations with its advisor and dealer manager and before GEAR made any supplement to its offering prospectus.

**E.   In Exchange for Finlay Causing Mission Trust to Sell the Trusts at Below-market Prices, GEAR Rewards Finlay by Purchasing Mission Management at an Inflated Price.**

207. GEAR was aware of Mission Trust's contractual and fiduciary duties owed to the Trusts and the Beneficiaries as it reviewed the Trust Agreements in connection with preparing for the GEAR Transaction.

208. Although they each knew that Mission Trust owed contractual and fiduciary duties and obligations to ensure that the Properties would not be sold on other than an arms-length basis and not to advance Finlay's own interests, GEAR and Finlay agreed that GEAR would pay excessive value for the business and assets of Mission Management through the

37

Mission Management Asset Purchase Agreement in exchange for Finlay causing Mission Trust to sell the Properties for less than fair consideration and under conditions that were harmful to the interests of the Trusts and the Beneficiaries.

209.     Pursuant to the terms of the Mission Management Asset Purchase Agreement, the following consideration was due to be paid to Finlay, Mission Management, and other affiliates: (a) $5,500,000 in cash (subject to certain adjustments); (b) $747,000 payable to Hunton & Williams for legal fees owed by Mission Management and its affiliates (although Hunton & Williams represented GEAR in the management entity transaction); (c) $50,000 payable to Jenner & Block LLP for legal fees due; (d) $500,000 payable to FBR Capital Markets & Co. for a fee due from an affiliate of Mission Management; and (e) certain consulting agreements that, according to GEAR's August 31, 2007 8-K filing, represents up to $1,200,000 in value to Finlay or entities he controls. Thus, the total consideration paid to Finlay directly or indirectly approximates $8,000,000. Many of these expenses, *i.e.*, Hunton & Williams and FBR, were not incurred by Mission Management, but instead represented on-going corporate operations of other affiliated companies.

210.     The total consideration of about $8,000,000 far exceeds the fair value of the business and assets of Mission Management. Even with a five year term remaining on its management agreements with various assets, Mission Management likely is worth less than $3 million.

211.     As described above, in exchange for an inflated price for the business and assets of Mission Management, Finlay caused the Trust to enter agreements to sell the Properties for depressed prices payable with OP Units that are worth much less than the publicly stated consideration.

212.   In addition, in connection with the Mission Management Asset Purchase Agreement, Finlay agreed to cause 41 multifamily properties – including the Properties at issue here – to enter long-term management agreements with GEAR with termination fees payable if the agreements are terminated without cause within five years, unless the agreements are terminated upon a sale of the subject property to GEAR.  Aside from the burden of these fees on the Properties, the effect of the termination fee arrangement is to give GEAR the inside track on acquiring the properties when offered for sale (*i.e.*, any purchaser who wants to outbid GEAR will have to bid a price that exceeds GEAR's price by an amount exceeding the termination fee).

## V.     The Beneficiaries Confront Finlay and Mission Trust About The GEAR Transaction.

213.   By letter, Mission Trust notified the beneficiaries of the Trusts that the trustee intended to sell the apartment complexes pursuant to the GEAR Transaction, specifically, Purchase and Sale Agreements.

214.   Subsequently, Mission Trust, as trustee of the Trusts, held teleconferences to discuss the Purchase and Sale Agreements with the beneficiaries of each of the Trusts (the "Teleconferences").

215.   During each of the Teleconferences, Finlay set forth specious explanations for selling the Property of each Trust for consideration that was obviously below what could be obtained in an arms-length transaction on the open market.

216.   Prior to, during, and subsequent to each of the Teleconferences, various Beneficiaries expressed their strong views and opinions against the GEAR Transaction.

217.    The beneficiaries overwhelmingly challenged Finlay, in his capacity as manager of Mission Trust, about the wisdom and fairness of entering into and closing on the GEAR Transaction.

218.    Mission Trust, acting through Finlay, breached its fiduciary duties by failing to: (a) consider the Beneficiaries' views and opinions in good faith including, without limitation, the views and opinions expressed and held by the Beneficiaries; (b) solicit the comments of the Beneficiaries in a fair and open process; and (c) provide complete and transparent information about the process used to select GEAR as the purchaser, and the terms of competing bids (if any).

219.    Each of the Trust Agreements requires Mission Trust to consider the views and opinions of the Beneficiaries in good faith before the sale of any trust property.

220.    By choosing to proceed to closing on the GEAR Transaction in light of the terms of the agreements and the concerns, views, and opinions expressed by the Beneficiaries, Mission Trust acted arbitrarily and unreasonably.

## VI.    The Beneficiaries Remove Mission Trust

221.    By Thursday, November 4, 2010, more than 50% of the Beneficiaries in six of the eight trusts voted, by written ballot, to remove Mission Trust as trustee, pursuant to Article X of each of the Trust Agreements, for willful misconduct and gross negligence.  Specifically, the Beneficiaries found the following causes to remove Mission Trust:

      a.       that Mission Trust improperly amended the Master Leases with the various Lease Amendments;

      b.       that Mission Trust entered the GEAR Transaction without soliciting and considering the opinions of the Beneficiaries in good faith prior to entering into the GEAR Transaction.  A majority in interest of the Trust's investors expressed opposition to the GEAR Transaction for the following reasons, among others:

i.   The Trustee failed to obtain any independent valuation of the Trust assets prior to agreeing to sell them;

ii.  The GEAR Transaction consideration to the Trusts is inadequate;

iii. There is no immediate need to sell the Trust assets at a historically low point in the real estate cycle;

iv.  The Trustee failed to obtain any independent valuation of the projected value of the GEAR shares upon exchange;

v.   Upon consummation of the GEAR Transaction, reserves which are required to be distributed to Trust investors upon a sale of the Trust assets are to be irrevocably transferred to a GEAR affiliate;

vi.  The Grubb & Ellis Company has severed any relationship with GEAR since the GEAR Agreement was signed.  The Trustee has failed to consider the impact of the termination of this relationship on GEAR's valuation and prospects;

vii. As a result of the GEAR Transaction the investors will no longer be able to do a like-kind exchange upon the sale of the Trust assets, which right was a material consideration for the investors when they purchased beneficial interests in the Trust; and

viii. In a related transaction, an affiliate of the Trustee is proposing to sell the right to manage the Trust assets for substantial cash consideration and fees payable to the Trustee affiliate and not to the Trust investors.

c.   Pursuant to the terms of the Trust Agreements, Mission Trust is required to distribute cash income from the Trust assets except what is needed for current and future expenses of the Trust.  Mission Trust suspended such distributions and is retaining cash which is the property of the Beneficiaries without proper justification or proper safeguards against use or commingling of such cash for improper purposes.

222.  Mission Trust's willful misconduct, including (without limitation) its self-dealing and refusal to act reasonably and in good faith in response to the Beneficiaries' legitimate and well-founded concerns about the Purchase and Sale Agreements, render futile any further efforts on behalf of the Beneficiaries to attempt to stop Mission Trust from proceeding with closing the remaining portion of the GEAR Transaction.

223.    Mission Trust's conduct alleged herein constitutes willful misconduct and gross negligence.

## DEMAND FUTILITY

224.    Demand upon Mission Trust in this case would have been futile and should be excused because there is reasonable doubt that Mission Trust on the one hand, and the Master Tenants, Mission Management, and Finlay on the other, are disinterested and independent, and/or that the challenged Lease Amendments and GEAR Transaction was a product of a valid exercise of business judgment.

225.    Finlay has divided loyalties.  With regard to the Master Lease amendments, Finlay appears on both sides of the transactions.  He indirectly is the controlling owner and manager of Mission Trust, and executed the Lease Amendments on behalf of the Trusts, thereby causing Mission Trust to breach its fiduciary duties to the Beneficiaries.  He is also indirectly the controlling owner and manager of the Master Tenants, which received all of the benefits of the Lease Amendments.

226.    Finlay is on both sides of the Lease Amendment transactions.  Finlay owns the controlling interest of Forward Capital, LLC, which is the sole member of Finlay Partners, LLC. Finlay Partners, LLC, in turn, is the sole member of both Mission Holdings and Mission Residential.  Finlay indirectly owns the controlling interests of both of these entities.  Further, Mission Holdings is the sole member of the Master Tenants, while Mission Residential is the sole member of Mission Trust.

227.    Because Mission Trust and the Master Tenants have common ownership, Finlay received a direct financial benefit upon execution of the Lease Amendments.  Mission Trust's

loyalty is divided because it owes a duty of loyalty both to its owners on the one hand, and to the Trusts and Beneficiaries on the other.

228.    It is clear that Mission Trust had divided loyalties and thus was not independent. As the signatory trustee of the Trusts, it had a fiduciary duty to the Trusts and the Beneficiaries. Finlay also had fiduciary duties to the manager of Mission Residential, the sole member of Mission Trust.  At the same time, however, Finlay personally controlled the actions of the Master Tenants, who benefited from the Lease Amendments.  Finlay signed the Lease Amendments on behalf of both parties, the Trusts and the Master Tenants.

229.    Finlay also has divided loyalties with regard to the GEAR Transaction, which included the sale to GEAR of eight Trust Properties and Mission Management. These two sales, executed on the same day, are part of the same transaction.  Finlay directed Mission Trust to breach its fiduciary duties to the beneficiaries by selling the Properties to GEAR for inadequate compensation, while at the same time reaping excessive compensation from GEAR for the sale of Mission Management, of which he is also the controlling owner and manager.  Through his controlling ownership of Mission Management, Finlay received a direct financial benefit for his agreement to sell the Trust Properties at a below-market price.  Mission Trust's loyalty is divided because it owes a duty of loyalty both to its owners on the one hand, and to the Trusts and Beneficiaries on the other.

230.    Based upon the facts presented above, there is reasonable doubt that Finlay and Mission Trust are not disinterested parties, and demand is excused.

## COUNT I
### Breach of Trust Agreements
### (Against Mission Trust)

231.   Plaintiffs restate and incorporate the allegations of paragraphs 1 through 230 as if fully stated herein.

232.   This claim is brought directly by the Beneficiaries of the Trusts for breach of the Trust Agreements.

233.   Each of the following Trust Agreements is a valid and enforceable contract: Preston Wood Trust, Battleground Park Trust, Briley Parkway Trust, Brentwood Trust, Capital Crossing Trust, Mayfield Downs Trust, Barton Creek Trust, and Tanglewood Trust.

234.   Each of the Trust Agreements contains an implied duty of good faith and fair dealing.

235.   Mission Trust breached the Trusts by, among other things: (a) failing to consider in good faith the views and opinions of the Beneficiaries before making the decision to dispose of the Property of each of the Trusts; (b) acting arbitrarily and unreasonably in the attempted disposition of the property of the Trusts such that Mission Trust has frustrated the purpose of each of the Trusts; (c) failing to preserve and protect the property of the Trusts; and (d) entering into the Lease Amendments with an affiliate on other than commercially reasonable terms.

236.   As a result of Mission Trusts' various breaches of the trust agreements, the Beneficiaries have suffered and/or will suffer irreparable harm and monetary damages.

**WHEREFORE**, the Beneficiaries pray for relief in their favor and against Mission Trust as follows:  (a) enjoining Mission Trust, and anyone acting in concert with it, from selling the Properties owned by each Trust; (b) enjoining Mission Trust from acting arbitrarily and unreasonably in the attempted disposition of the Property of each Trust; and (c) awarding the

Beneficiaries any further relief that the Court deems just and equitable. Unless Mission Trust is enjoined from consummating the sale of Properties, the Beneficiaries will suffer irreparable losses. If the transaction does close, the Beneficiaries request an award of monetary damages, including compensatory damages, punitive damages, and the costs associated with this litigation (including attorneys' fees), the precise amount of which will be determined at trial.

## COUNT II
### Breach of Fiduciary Duty of Loyalty
### (Against Mission Trust and Finlay)

237. Plaintiffs restate and incorporate the allegations of paragraphs 1 through 236 as if fully stated herein.

238. This claim is brought directly by the Beneficiaries of the Trusts and derivatively on behalf of the Trusts, for breach of the fiduciary duty of loyalty by Mission Trust.

239. For the reasons stated previously and incorporated herein, it would be futile to make a demand on Mission Trust.

240. Mission Trust owes a fiduciary duty of undivided loyalty to the Trusts and their Beneficiaries. As owner (indirectly through affiliates) and manager of Mission Trust, Finlay is responsible for the Mission Trust exercising and fulfilling its fiduciary duties to the Trusts.

241. Mission Trust breached its fiduciary duties by, among other things: (a) amending the Master Lease associated with each Trust (excluding the Briley Parkway Master Lease and the Barton Creek Master Lease) in a self-interested manner such that the Master Tenant received all, and the Beneficiaries received none, of the benefits of the amendment; (b) negotiating and executing documents to dispose of the property of the Trusts in a manner that is principally designed to benefit Mission Trust and its affiliates at the expense of the Beneficiaries, and for

unfair and inadequate consideration; (c) failing to preserve and protect the Property of the Trusts; and (d) usurping for itself and its affiliates the opportunity of the Trust to receive the profits and other benefits attributable to ownership of the Property

242.     Finlay directed Mission Trust's breaches of fiduciary duty and self-dealing acts, and as the majority owner of Mission Trust (indirectly through other affiliates), derived substantial personal benefit from Mission Trust's breaches and wrongful acts.

243.     Defendants received value directly and derivatively, from their scheme to the detriment of the Trust.

244.     The usurpation of the foregoing opportunity is patently and intrinsically unfair because the transaction was self-interested.

245.     Mission Trust's self-dealing acts constitute willful misconduct and/or gross negligence.

246.     As a proximate and direct result of the foregoing, the Trusts and Beneficiaries have been deprived of the benefit and value of the assets, the remedy at law for which is inadequate.

247.     By reason of the foregoing, the trusts are entitled to rescind the challenged agreements (the Lease Amendments and GEAR Transaction documents). Given that the Master Tenants are affiliates of Mission Trust, the Master Tenants had knowledge of the fraudulent actions of Mission Trust. Moreover GEAR had knowledge that the consideration it agreed to pay for the Properties was grossly inadequate, and that it was grossly overpaying for Mission Management.

248.   The conduct of Defendants in intentionally and deliberately usurping an opportunity of the Trusts in knowing violation of their fiduciary duties was outrageous conduct for which an award of punitive damages in favor of the Trusts is warranted.

**WHEREFORE**, the Beneficiaries, directly and derivatively, pray for relief in their favor and against Mission Trust and Finlay as follows:  (a) enjoining Mission Trust, and anyone acting in concert with it, from selling the Properties owned by each Trust; (b) enjoining Mission Trust from acting arbitrarily and unreasonably in the attempted disposition of the Property of each Trust; and (c) awarding the Beneficiaries any further relief that the Court deems just and equitable.   Unless Mission Trust is enjoined from consummating the sale of Properties, the Beneficiaries will suffer irreparable losses.   If the transaction does close, the Beneficiaries request an award of monetary damages, including compensatory damages, punitive damages, and the costs associated with this litigation (including attorneys' fees), the precise amount of which will be determined at trial.

**COUNT III**
**Breach of Fiduciary Duty – Misappropriation of Trust Property**
**(Against Mission Trust and Finlay)**

249.   Plaintiffs restate and incorporate the allegations of paragraphs 1 through 248 as if fully stated herein.

250.   This claim is brought directly by the Beneficiaries of the Trusts and derivatively on behalf of the Trusts, for breach of the fiduciary duty against Mission Trust and Finlay.

251.   For the reasons stated previously and incorporated herein, it would be futile to make a demand on Mission Trust.

252.  Mission Trust owes a fiduciary duty of prudence of care to the Trusts and their Beneficiaries.  As owner (indirectly through affiliates) and manager of Mission Trust, Finlay is responsible for the Mission Trust exercising and fulfilling its fiduciary duties to the Trusts.

253.  All entity defendants except GEAR were instrumentalities and/or alter egos of Finlay, with and through which Finlay engaged in the wrongful transactions involving the Trusts that are the subject of this action.

254.  Mission Trust had a duty to obtain adequate consideration for the Properties to be sold pursuant to the GEAR Transaction as part of any contract for the disposition of the Properties. Mission Trust also had a duty to enter into Lease Amendments with affiliates only on commercially reasonable terms.

255.  Mission Trust entered into a contract for the disposition of the Properties with knowledge that the consideration to be received was inadequate.

256.  Mission Trust acted neither in good faith nor in the best interests of the Trusts in connection with the foregoing wrongful conduct because said conduct lacked legitimate business purposes, was tainted by conflicts of interest, and/or resulted in a prolonged failure by Mission Trust to exercise due care.

257.  As a proximate and direct result of the foregoing, the Trusts and Beneficiaries have been deprived of the benefit and value of the assets of the Trusts, the remedy at law for which is inadequate.

258.  Finlay directed Mission Trust's breaches of fiduciary duty and self-dealing acts, and as the majority owner of Mission Trust (indirectly through other affiliates), derived substantial personal benefit from Mission Trust's breaches and wrongful acts.

259.   By reason of the foregoing, the Trusts are entitled to rescind the challenged agreements (the Lease Amendments and GEAR Transaction documents).  Given that the Master Tenants are affiliates of Mission Trust, the Master Tenants had knowledge of the fraudulent actions of Mission Trust.  Moreover GEAR had knowledge that the consideration it agreed to pay for the Properties was grossly inadequate, and that it was grossly overpaying for Mission Management.

260.   The conduct of Defendants in intentionally and deliberately usurping an opportunity of the Trusts in knowing violation of their fiduciary duties was outrageous conduct for which an award of punitive damages in favor of the Trusts is warranted.

**WHEREFORE**, the Beneficiaries, directly and derivatively, pray for relief in their favor and against Mission Trust and Finlay as follows: (a) enjoining Mission Trust, and anyone acting in concert with it, from selling the Properties owned by each Trust; (b) enjoining Mission Trust from acting arbitrarily and unreasonably in the attempted disposition of the Property of each Trust; and (c) awarding the Beneficiaries any further relief that the Court deems just and equitable.  Unless Mission Trust is enjoined from consummating the sale of Properties, the Beneficiaries will suffer irreparable losses.  If the transaction does close, the Beneficiaries request an award of monetary damages, including compensatory damages, punitive damages, and the costs associated with this litigation (including attorneys' fees), the precise amount of which will be determined at trial.

## COUNT IV
## Breach of Fiduciary Duty – Usurpation of Opportunity
### (Against Mission Trust and Finlay)

261. Plaintiffs restate and incorporate the allegations of paragraphs 1 through 260 as if fully stated herein.

262. This claim is brought directly by the Beneficiaries of the Trusts and derivatively on behalf of the Trusts, for breach of the fiduciary duty against Mission Trust and Finlay.

263. For the reasons stated previously and incorporated herein, it would be futile to make a demand on Mission Trust.

264. The agreement to transfer the sole asset of the Trusts for inadequate and unfair consideration has resulted in Mission Trust and Finlay usurping for themselves the opportunity of the Trusts.

265. Defendants received value directly and derivatively, from their usurpation of the foregoing opportunity to the detriment of the Trusts and Beneficiaries.

266. The usurpation of the Lease Amendments is patently and intrinsically unfair because Mission Trust and Finlay appeared on both sides of the transaction.

267. The GEAR Transaction is patently and intrinsically unfair because inadequate consideration was contracted to be paid so that Finlay and his affiliates could reap excessive compensation from GEAR for the sale of Mission Management.

268. As a proximate and direct result of the foregoing, the Trusts and Beneficiaries have been deprived of the benefit and value of the assets of the Trusts, the remedy at law for which is inadequate.

269.    Finlay directed Mission Trust's breaches of fiduciary duty and self-dealing acts, and as the majority owner of Mission Trust (indirectly through other affiliates), derived substantial personal benefit from Mission Trust's breaches and wrongful acts.

270.    By reason of the foregoing, the Trusts are entitled to rescind the challenged agreements (the Lease Amendments and GEAR Transaction documents). Given that the Master Tenants are affiliates of Mission Trust, the Master Tenants had knowledge of the fraudulent actions of Mission Trust. Moreover GEAR had knowledge that the consideration it agreed to pay for the Properties was grossly inadequate, and that it was grossly overpaying for Mission Management.

271.    The conduct of Defendants in intentionally and deliberately usurping an opportunity of the Trusts in knowing violation of their fiduciary duties was outrageous conduct for which an award of punitive damages in favor of the Trusts is warranted.

**WHEREFORE**, the Beneficiaries, directly and derivatively, pray for relief in their favor and against Mission Trust and Finlay as follows: (a) enjoining Mission Trust, and anyone acting in concert with it, from selling the Properties owned by each Trust; (b) enjoining Mission Trust from acting arbitrarily and unreasonably in the attempted disposition of the Property of each Trust; and (c) awarding the Beneficiaries any further relief that the Court deems just and equitable. Unless Mission Trust is enjoined from consummating the sale of Properties, the Beneficiaries will suffer irreparable losses. If the transaction does close, the Beneficiaries request an award of monetary damages, including compensatory damages, punitive damages, and the costs associated with this litigation (including attorneys' fees), the precise amount of which will be determined at trial.

## COUNT V
## Aiding and Abetting Breach of Fiduciary Duties
### (Against GEAR)

272.    Plaintiffs restate and incorporate the allegations of paragraphs 1 through 271 as if fully stated herein.

273.    This claim is brought derivatively on behalf of the Trusts for aiding and abetting Mission Trust in its breaches of fiduciary duties against the Trusts and Beneficiaries. For the reasons stated previously and incorporated herein, it would be futile to make a demand on Mission Trust.

274.    Mission Trusts owe fiduciary duties to the Trusts and Beneficiaries.

275.    Mission Trust used the GEAR Transaction to sell the Properties to GEAR for inadequate compensation, while at the same time reaping excessive compensation from GEAR for the sale of Mission Management.

276.    GEAR knowingly participated in the breaches of fiduciary duties by agreeing to pay an excessive amount for Mission Management in exchange for an agreement with the trusts to purchase the Properties for inadequate consideration. In so agreeing, GEAR made possible Mission Trust's fiduciary duty breaches.

277.    The Trusts and Beneficiaries were damaged by GEAR's knowing participation in this scheme.

278.    As a proximate and direct result of the foregoing, the Trusts have suffered injuries in an amount to be determined at trial.

**WHEREFORE**, the Beneficiaries, derivatively, pray for relief in their favor and against GEAR as follows: (a) enjoining GEAR and anyone acting in concert with it, from acquiring the Properties owned by each Trust; and (b) awarding the Beneficiaries any further relief that the

Court deems just and equitable. Unless GEAR is enjoined from consummating the sale of Properties, the Beneficiaries will suffer irreparable losses. If the transaction does close, the Beneficiaries request an award of monetary damages, including compensatory damages, punitive damages, and the costs associated with this litigation (including attorneys' fees), the precise amount of which will be determined at trial.

## COUNT VI
### Tortious Interference with Contractual Relations
### (Against GEAR)

279.   Plaintiffs restate and incorporate the allegations of paragraphs 1 through 278 as if fully stated herein.

280.   This claim is brought against GEAR directly by the Beneficiaries and derivatively on behalf of the Trusts for tortious interference with contractual relation. For the reasons stated previously and incorporated herein, it would be futile to make a demand on Mission Trust.

281.   The Beneficiaries are parties to the Trust Agreements, and have a property right in the performance of, and anticipated benefits from, the Trust Agreements.

282.   GEAR was aware of the Trust Agreements, and the Beneficiaries' rights and benefits therein, and interfered with the Trust Agreements by agreeing to pay an excessive amount for Mission Management in exchange for an agreement with the Trusts to purchase the Properties for inadequate consideration. In so agreeing, GEAR caused and assisted Mission Trust in breaching the Trust Agreements.

283.   GEAR's interference was intentional, malicious, and without justification or excuse.

284.   GEAR's interference resulted in substantial damage to the Trusts and Beneficiaries.  GEAR's interference resulted in substantial damage to the Beneficiaries.

285.   GEAR's interference was wantonly reckless or malicious.  Therefore, punitive damages should be awarded.

**WHEREFORE**, the Beneficiaries, directly and derivatively, pray for relief in their favor and against GEAR as follows:  (a) enjoining GEAR and anyone acting in concert with it, from acquiring the Properties owned by each Trust; and (b) awarding the Beneficiaries any further relief that the Court deems just and equitable.  Unless GEAR is enjoined from consummating the sale of Properties, the Beneficiaries will suffer irreparable losses.  If the transaction does close, the Beneficiaries request an award of monetary damages, including compensatory damages, punitive damages, and the costs associated with this litigation (including attorneys' fees), the precise amount of which will be determined at trial.

### COUNT VII
### Civil Conspiracy
### (Against All Defendants)

286.   Plaintiffs restate and incorporate the allegations of paragraphs 1 through 285 as if fully stated herein.

287.   This claim is brought derivatively on behalf of the Trusts for civil conspiracy against all Defendants.  For the reasons stated previously and incorporated herein, it would be futile to make a demand on Mission Trust.

288.   Pursuant to an agreement, Defendants acted together in furtherance of the conspiracy to defraud the Trusts and Beneficiaries by making intentional misrepresentations or omissions to them concerning the Lease Amendments and GEAR Transactions, including

agreeing to transfer the Trust Properties for less than fair consideration while transferring Mission Management for a price far exceeding fair value, and/or by knowingly acting to facilitate the activities of those who made such misrepresentations or omissions to the Beneficiaries.

289.    As a result of these actions, the Trusts and Beneficiaries sustained actual damages in an amount to be determined at trial.

**WHEREFORE**, the Beneficiaries pray for relief in their favor and against Defendants as follows:  (a) enjoining Mission Trust, and anyone acting in concert with it, from selling the Properties owned by each Trust; (b) enjoining Mission Trust from acting arbitrarily and unreasonably in the attempted disposition of the Property of each Trust; and (c) awarding the Beneficiaries any further relief that the Court deems just and equitable.  Unless Mission Trust is enjoined from consummating the sale of Properties, the Beneficiaries will suffer irreparable losses.  If the transaction does close, the Beneficiaries request an award of monetary damages, including compensatory damages, punitive damages, and the costs associated with this litigation (including attorneys' fees), the precise amount of which will be determined at trial.

### COUNT VIII
### Books and Records
### (Against Mission Trust)

290.    Plaintiffs restate and incorporate the allegations of paragraphs 1 through 289 as if fully stated herein.

291.    This claim is brought directly by the Beneficiaries.

292.    Section 7.04 of the Trust Agreements requires that Mission Trust "keep customary and appropriate books and records relating to the Trust and the Trust Property" and "maintain

separate books and records for each [Beneficiary's] Interest and shall provide reports of income and expenses to each [Beneficiary] as necessary for such [Beneficiary] to prepare his/her income tax returns regarding the Trust Property." Section 7.05 mandates that Mission Trust "furnish to the [Beneficiaries], copies of all reports, notices, requests, demands, certificates, financial statements and any other writings pursuant to the Transaction Documents, which the Investors have not otherwise received."

293.   Section 3819 of the Delaware Statutory Trust Act grants the Beneficiaries rights to access the books and records of the Trusts.  Specifically, Section 3819(a) provides:

> Except to the extent otherwise provided in the governing instrument of a statutory trust, each beneficial owner of a statutory trust has the right, subject to reasonable standards (including standards governing what information and documents are to be furnished at what time and location and at whose expense) as may be established by the trustees, to obtain from the statutory trust from time to time upon reasonable demand for any purpose reasonably related to the beneficial owner's interest as a beneficial owner of the statutory trust:

> (1) A copy of the governing instrument and certificate of trust and all amendments thereto, together with copies of any written powers of attorney pursuant to which the governing instrument and any certificate and any amendments thereto have been executed;

> \*      \*      \*

> (3) Information regarding the business and financial condition of the statutory trust; and

> (4) Other information regarding the affairs of the statutory trust as is just and reasonable.

294.   On October 6, 2010, consistent with Section 7.04 of the Trust Agreements and section 3819 of the Delaware Statutory Trust Act, the Beneficiaries, through counsel, requested Trust records.  Mission Trust failed to furnish the records requested.

295.    Again, on October 25, 2010, the Beneficiaries, through counsel, requested Trust records.  Again, Mission Trust failed to furnish the records requested.

**WHEREFORE**, the Beneficiaries pray for relief in their favor and against Mission Trust as follows:   (a) a temporary restraining order and preliminary injunction compelling Mission Trust to provide to the Beneficiaries all books and records to which they are entitled by law and the Trust Agreements; and (b) awarding the Beneficiaries any further relief that the Court deems just and equitable.

## COUNT IX
### Injunctive Relief/Declaratory Relief
#### (Against All Defendants)

296.    Plaintiffs restate and incorporate the allegations of paragraphs 1 through 295 as if fully stated herein.

297.    This claim is brought derivatively on behalf of the Trusts, as well as directly by the Beneficiaries.  For the reasons stated previously and incorporated herein, it would be futile to make a demand on Mission Trust.

298.    As a result of the foregoing misconduct, Plaintiffs respectfully request that this Court:

    a.     Rescind and declare void the Lease Amendments so that the Master Leases are returned to their proper status;

    b.     Rescind and declare void the GEAR Transaction;

    c.     Enjoin Mission Trust, and anyone acting in concert with it, from selling the Property of each Trust;

    d.     Require Mission Trust to consider in good faith the views and opinions of the Beneficiaries before making the decision to dispose of the Property of each Trust; and

    e.     Enjoin Mission Trust from acting arbitrarily and unreasonably in the attempted disposition of the Property of each Trust;

f.     Declare that Mission trust has willfully and materially breached the trust Agreements;

g.     Enjoin Mission Trust from acting on behalf of the Trusts; and

h.     Directing Mission Trust to provide immediately to the Beneficiaries all books and records to which they are entitled by law and the Trust Agreements.

Respectfully submitted,

_____

Matthew B. Kirsner, Esq. (VSB # 41615)
Jennifer E. Lattimore, Esq. (VSB # 71188)
ECKERT SEAMANS CHERIN &
MELLOTT, LLC
707 East Main Street, Suite 1450
Richmond, Virginia 23219
Telephone (804) 788-7740
Fax (804) 698-2950
mkirsner@eckertseamans.com
jlattimore@eckertseamans.com


Thomas C. Dame, Federal Bar No. 08352
Paul S. Caiola, Federal Bar No. 23940
David G. Sommer, Federal Bar No. 27581
Hillary H. Arnaoutakis, Federal Bar No. 28808
GALLAGHER EVELIUS & JONES LLP
218 North Charles Street, Suite 400
Baltimore, Maryland  21201
Telephone: (410) 727-7702
Fax: (410) 468-2786
tdame@gejlaw.com
pcaiola@gejlaw.com
dsommer@gejlaw.com
harnaoutakis@gejlaw.com

*Motions for Pro Hac Vice Admission Pending*

Attorneys for Plaintiffs

Date:  November 9, 2010

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 9th day of November, 2010, a copy of Plaintiffs' Verified Complaint for Injunctive Relief and Damages was served upon the following via email transmission:

William G. Tishkoff, Esq.
Tishkoff & Associates PLLC
407 N. Main Street
Ann Arbor MI 48104
will@tishlaw.com


Thomas C. O'Brien, Esq.
Miller Canfield
101 N. Main Street, 7th Fl.
Ann Arbor MI 48104
obrient@millercanfield.com


Steven R. Meier, Esq.
Jenner & Block
353 N. Clark Street
Chicago IL 60654-3456
smeier@jenner.com

*Known Counsel for Mission Trust Services, LLC; Mission Residential, LLC; Mission Residential Holdings, LLC; Grubb & Ellis Apartment REIT Holdings, L.P.; Mission Barton Creek Leaseco, LLC; Mission Battleground Park Leaseco, LLC; Mission Brentwood Leaseco, LLC; Mission Briley Parkway Leaseco, LLC; Mission Capital Crossing Leaseco, LLC; Mission Mayfield Downs Leaseco, LLC; Mission Preston Wood Leasco, LLC; and Mission Tanglewood Leaseco, LLC*

Daniel M. LeBey, Esq.
Hunton & Williams
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond VA 23219
dlebey@hunton.com

*Known Counsel for Grubb & Ellis Apartment REIT Holdings, L.P.*

Christopher Finlay
cfinlay@FwdCapital.com

Matthew B. Kirsner, Esq. (VSB # 41615)
Jennifer E. Lattimore, Esq. (VSB # 71188)
ECKERT SEAMANS CHERIN &
MELLOTT, LLC
707 East Main Street, Suite 1450
Richmond, Virginia 23219
Telephone (804) 788-7740
Fax (804) 698-2950
mkirsner@eckertseamans.com
jlattimore@eckertseamans.com

## VERIFICATION

I solemnly affirm under the penalties of perjury that the contents of the foregoing Complaint for Injunctive Relief and Damages are true and correct to the best of my knowledge, information and belief.

Michael F. St. Pierre

Date: November 8-2010

# 410142

## **VERIFICATION**

I solemnly affirm under the penalties of perjury that the contents of the foregoing Complaint for Injunctive Relief and Damages are true and correct to the best of my knowledge, information and belief.

Dennis Dupray

Date: _Nov. 8, 2010_

11/08/2010 10:31 FAX 8608861304          BIG Y PHARMACY NORWICH                    ☑001

## VERIFICATION

I solemnly affirm under the penalties of perjury that the contents of the foregoing Complaint for Injunctive Relief and Damages are true and correct to the best of my knowledge, information and belief.

_____

Stephen A. St. Germain

Date: _Nov 8th 2010_

# 410142
012959-0001

## VERIFICATION

I solemnly affirm under the penalties of perjury that the contents of the foregoing Complaint for Injunctive Relief and Damages are true and correct to the best of my knowledge, information and belief.

Hans A. Stenfert Kroese

HSK

Date: __11-8-10__

Hans A. Stenfert Kroese

# 410142
012959-0001

## VERIFICATION

I solemnly affirm under the penalties of perjury that the contents of the foregoing Complaint for Injunctive Relief and Damages are true and correct to the best of my knowledge, information and belief.

_____
James D. Harmon

Date: __11/8/10__

## **VERIFICATION**

I solemnly affirm under the penalties of perjury that the contents of the foregoing Complaint for Injunctive Relief and Damages are true and correct to the best of my knowledge, information and belief.

Stephen R. Caragol

Date: 11-8-2010

# 410142
012959-0001

## VERIFICATION

I solemnly affirm under the penalties of perjury that the contents of the foregoing Complaint for Injunctive Relief and Damages are true and correct to the best of my knowledge, information and belief.

Jacynda B. Earl

Date: 11-8-10

#410142
017058.0001

## INDEX OF EXHIBITS

| Exhibit | Description |
| --- | --- |
| 1. | Organizational Charts |
| 2. | Mission Preston Wood Trust Agreement |
| 3. | Mission Battleground Trust Agreement |
| 4. | Mission Briley Parkway Trust Agreement |
| 5. | Mission Brentwood Trust Agreement |
| 6. | Mission Mayfield Trust Agreement |
| 7. | Mission Capital Crossing Trust Agreement |
| 8. | Mission Barton Creek Trust Agreement |
| 9. | Mission Tanglewood Trust Agreement |
| 10. | Mission Mayfield Master Lease |
| 11. | Mission Mayfield Lease Amendment |
| 12. | Mission Capital Crossing Master Lease |
| 13. | Mission Capital Crossing Lease Amendment |
| 14. | Mission Preston Wood Master Lease |
| 15. | Mission Preston Wood Lease Amendment |
| 16. | Mission Battleground Master Lease |
| 17. | Mission Battleground Lease Amendment |
| 18. | Mission Brentwood Master Lease |
| 19. | Mission Brentwood Lease Amendment |
| 20. | Mission Tanglewood Master Lease |
| 21. | Mission Tanglewood Lease Amendment |
| 22. | Grubb & Ellis REIT 8-K Filing (8/31/10) & Asset Purchase Agreement |
| 23. | Mission Tanglewood Purchase & Sale Agreement |
| 24. | Mission Capital Crossing Purchase & Sale Agreement |
| 25. | Mission Barton Creek Purchase & Sale Agreement |
| 26. | Mission Briley Parkway Purchase & Sale Agreement |
| 27. | Mission Preston Wood Purchase & Sale Agreement |
| 28. | Mission Battleground Purchase & Sale Agreement |
| 29. | Mission Mayfield Downs Purchase & Sale Agreement |
| 30. | Mission Brentwood Purchase & Sale Agreement |

# 410143